KING PAGANO HARRISON
Jeffrey W. Pagano (JP-1408)
Gary A. Stahl (GS-3987)
75 Rockefeller Plaza
New York, New York 10019
(212) 223-4000
Attorneys for Plaintiff



06 CV 5801

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-------------------------------------------------------- x
                                :

**ARTHUR J. RIEL,**                    :

                      :    **Case No.:**

             **Plaintiff,**    :

                      :

           v.             :    **COMPLAINT**

**MORGAN STANLEY and**       :
**MORGAN STANLEY & CO., INC.,**     :

                      :

            **Defendants.**    :

                      :
-------------------------------------------------------- x

       Plaintiff Arthur J. Riel, by his attorneys, King Pagano Harrison, as and for his Complaint against Defendants Morgan Stanley and Morgan Stanley & Co., Inc. (collectively referred to herein as "Morgan Stanley," unless otherwise specified), states and alleges as follows:

**I.**

**PRELIMINARY STATEMENT**

       1.     At a time when the operations of a large organization are increasingly measured in terms of e-mail, electronic transactions and Information Technology, Morgan Stanley placed Arthur Riel at one of its nerve centers. Arthur Riel, the Executive Director of Morgan Stanley's Law IT Department, was responsible for developing a searchable, permanent e-mail archive to meet the SEC's requirements and to enhance Morgan Stanley's ability to manage its own information. He designed systems that permitted Morgan Stanley to review critical electronic transactions and communications, in compliance with SEC directives. In addition, Mr. Riel interfaced with the in-house lawyers of Morgan Stanley's Law Division to

develop IT solutions to meet the demands that regulatory inquiries and litigation placed upon Morgan Stanley.

2.      In the course of his duties, which included routine testing of e-mail archive systems and sampling e-mails captured in archive searches, Mr. Riel discovered evidence of improper gift solicitations between Morgan Stanley and its vendors, and conflicts of interest between Morgan Stanley and its customers.  He also discovered that, in violation of federal statutes and SEC orders, Morgan Stanley had a disorganized system of storing and recycling e-mail backup tapes that regularly and repeatedly destroyed substantial volumes of e-mail.  Mr. Riel reported these matters to his superiors and to other Morgan Stanley personnel who had the power to stop these practices -- but Morgan Stanley investigated Mr. Riel instead.  After examining the same e-mail retention practices, the SEC imposed a fine of $15 million against Morgan Stanley.

3.      Mr. Riel's responsibilities at Morgan Stanley also put him at the center of the recent Coleman (Parent) Holdings litigation in Florida.  Mr. Riel warned Morgan Stanley's in-house lawyers about the existence of a potentially relevant body of e-mail that Morgan Stanley failed to produce -- and he would not compromise on that basic fact when Morgan Stanley became subject to severe sanctions imposed by the Florida Court.  Eventually, Morgan Stanley's conduct led to a $1.4 billion jury verdict against Morgan Stanley.

4.      Because Mr. Riel reported improper solicitations and conflicts of interest at Morgan Stanley; because he reported the ongoing and unlawful destruction of e-mail; and because he would not alter the facts to hide Morgan Stanley's wrongful conduct in the midst of a high-profile litigation, Morgan Stanley retaliated against Mr. Riel and terminated his employment.  Mr. Riel instituted a Sarbanes-Oxley proceeding, but OSHA failed to act within Sarbanes-Oxley's statutory time parameters.  Accordingly, Mr. Riel seeks compensatory damages and all other relief available to him under the Sarbanes-Oxley Act, 18 U.S.C. § 1514A ("SOX").

## II.

## PARTIES

5.     Plaintiff Arthur J. Riel ("Mr. Riel") is a citizen of the United States and an individual residing in the State of Connecticut.  Mr. Riel was employed by Morgan Stanley Co., Inc. from September 11, 2000 until September 27, 2005, and was the Executive Director of Morgan Stanley's Company IT Division.  During the same period, Mr. Riel was also Manager of Morgan Stanley's Law IT Department.

6.     Defendant Morgan Stanley & Co., Inc. is a Delaware corporation with its principal place of business in New York, New York.  Morgan Stanley & Co., Inc. is a broker-dealer registered with the Securities and Exchange Commission (the "SEC") pursuant to Section 15(b) of the Securities and Exchange Act of 1934 (the "Exchange Act"), and is a member of NASD and the New York Stock Exchange.  At all times relevant to this Amended Complaint, Morgan Stanley & Co., Inc. was required to file reports under Section 15(d) of the Exchange Act.

7.     Defendant Morgan Stanley, which is the parent company of Morgan Stanley & Co., Inc., is also a Delaware corporation with its principal place of business in New York, New York.  At all times relevant to this Amended Complaint, Morgan Stanley is and has been a registered issuer of securities under the Exchange Act.

8.     Both Defendant Morgan Stanley & Co., Inc. and Defendant Morgan Stanley maintain their worldwide headquarters at 1585 Broadway, New York, New York 10036. Both Defendants are collectively referred to herein as "Morgan Stanley."

9.     At all relevant times, each Defendant acted with knowledge of the other's conduct with respect to the matters alleged herein, and as agents for each other.

## III.

### JURISDICTION AND VENUE

10.    This Court has federal question jurisdiction over Mr. Riel's claims pursuant to 28 U.S.C. § 1331 and 18 U.S.C. § 1514A(b)(1)(b) pursuant to the Court's federal question jurisdiction.

11.    This Court also has diversity jurisdiction over Mr. Riel's claims pursuant to 28 U.S.C. § 1332(a), as the parties are citizens of different states and the amount in controversy is in excess of $75,000, exclusive of interest and costs.

12.    Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391(a) and (c) because at all times material and relevant, Morgan Stanley transacts and transacted business in this judicial district and because significant portions of the conduct alleged herein occurred in this judicial district.

### IV.

### STATEMENT OF FACTS

**A.    In the Late 1990s, Morgan Stanley Was
Without A Reliable System to Retain Its Own E-Mails**

13.    Morgan Stanley is known around the globe, and it is currently the second-largest securities and investment banking firm in the world.  Every year, Morgan Stanley's employees generate and receive hundreds of millions of e-mail messages, both internal and external, as they communicate with, advise and trade securities on behalf of retail and large institutional investors.  E-mails have become the largest and most comprehensive record of Morgan Stanley's activities on a day-to-day basis.

14.    Morgan Stanley's method of retaining and archiving its e-mails in the late 1990s and early in this decade could best be described as haphazard.  Morgan Stanley relied on an unwieldy system of backup tapes, some of which were compiled on a daily basis, and some of which were compiled at the end of each week.  Morgan Stanley had no reliable or unified system of cataloging its backup tapes, storing them or accessing them.  In some instances, the index

numbers assigned to the tapes were duplicative, which complicated efforts to locate the tapes required to perform a search for e-mail. Some tapes held e-mails and other electronic files. The process of locating back-up tapes, ascertaining which files were on the back-up tapes and gathering e-mails from the tapes was expensive, error-prone and time-consuming. Tapes were frequently subject to "read errors" that resulted in partial or sometimes complete loss of the information they contained. In addition, Morgan Stanley's backup tapes were regularly recycled or overwritten, which also resulted in a total information loss.

**B.    Morgan Stanley's Litigation Strategy Took Advantage
Of the Company's Lack of a Reliable E-mail Retention System**

15.    Morgan Stanley routinely receives requests to search its e-mail for materials required in regulatory matters and materials responsive to litigation production requests. In the late 1990s and the early part of this decade, the process of searching for e-mail first required Morgan Stanley to find and then select the correct backup tapes to search. Morgan Stanley's weekly backup tapes did not contain the same amount of information as its "incremental" backup tapes, which were compiled on a daily basis. When performing searches to satisfy regulatory requests or to produce materials in litigation, Morgan Stanley would routinely check only its weekly backup tapes.

16.    The "backup tape" method of searching for responsive e-mails had another significant limitation: e-mails could be excluded from the backup tapes altogether if the recipient deleted the e-mail and then emptied the "trash" file on his or her individual PC. By performing this "double delete" operation, e-mails could be deliberately and permanently excluded from any search that Morgan Stanley was capable of performing.

17.    Upon information and belief, by the late 1990s and the early part of this decade Morgan Stanley's in-house lawyers and its outside counsel were well versed with the limitations of such e-mail searches -- which they exploited. Morgan Stanley and its lawyers could assert that various backup tapes were searched while knowing that the searches were inherently unreliable, and that significant quantities of potentially harmful e-mail would not be

located. Searching backup tapes became, in effect, a method that Morgan Stanley utilized to limit scrutiny by its regulators, to minimize its liability and to maximize its value to its shareholders.

**C.     The SEC Twice Orders Morgan Stanley to Retain and Manage Its E-mail**

18.     In 2001, the SEC focused its attention on Morgan Stanley's failure to institute a system to archive and retrieve e-mails. SEC regulations required Morgan Stanley to segregate, store and index its e-mail so that it could be promptly retrieved. Morgan Stanley's e-mail retention system failed to comply with the governing SEC regulations or the requirements of the Exchange Act. In or about January 2001, the SEC ordered Morgan Stanley to cease its practice of "recycling" e-mail backup tapes, in which older e-mails were overwritten with new material.

19.     In early 2001, Mr. Riel was the Executive Director of the Law IT Department, a branch of Morgan Stanley's Company IT Division. The Company IT Department provided centralized IT services and centralized electronic data storage for all of Morgan Stanley's four major divisions. Those divisions were Institutional Securities (largely composed of Morgan Stanley & Co.), Asset Management (largely composed of Van Kampen Mutual Funds), Retail (formerly known as Dean Witter) and Discover Card operations. Mr. Riel's Law IT Department performed IT services and electronic information management primarily for two departments within Morgan Stanley's Law Division: the Litigation Department and the Compliance Department. At that time, Mr. Riel's supervisor approached him regarding the development of an e-mail retention system that would comply with the SEC's directives and other e-mail retention requirements under the Exchange Act. Mr. Riel began to design a solution, but Morgan Stanley's Law Division shelved the e-mail retention project.

20.     The SEC continued to scrutinize Morgan Stanley and other investment banking companies. In 2002, the SEC issued a "Wells Notice," in which it alleged that Morgan Stanley failed to archive e-mails in a reliable and searchable format known as "Write-Once, Read-Many" or "WORM." In response, Morgan Stanley instructed Mr. Riel to make the e-mail

retention system a priority once more.  In March 2002, he presented the specifications for an e-mail retention system and the expected costs of implementing such a system to Morgan Stanley's senior legal and IT personnel, who approved the project.

21.    Mr. Riel and his IT team resumed the task of implementing a new and comprehensive e-mail retention system for Morgan Stanley.  The functionality requirements of the archive were staggering:  the archive would need to capture, automatically and in real time, all of the e-mail sent and received in Morgan Stanley's institutional division; eliminate duplicate e-mails; and store the e-mails permanently.

22.    In or around May 2002, Morgan Stanley's litigation department informed Mr. Riel that he might be called upon to participate in a hearing before the SEC to answer the charges in the Wells Notice and to inform the SEC about the e-mail retention system that he was developing.  In preparation for the hearing, Mr. Riel had lengthy discussions with members of Morgan Stanley's Storage Group, which operated under the direction of the Institutional IT Division.  William Hollister ("Hollister") and Robert Saunders ("Saunders"), both of whom worked in the Storage Group, explained to Mr. Riel that Morgan Stanley had gathered approximately 39,000 "backup tapes" which likely contained e-mail that Morgan Stanley was required to retain under the Exchange Act and the SEC's rules.  Hollister and Saunders also presented Mr. Riel with spreadsheets that demonstrated Morgan Stanley's inability to comply with the SEC's e-mail inquiries.  The spreadsheets showed that Morgan Stanley was unable to locate approximately one-third of its 39,000 backup tapes.

23.    At the SEC's Wells Notice hearing, Morgan Stanley disclosed to the SEC, among other things, that it had approximately 39,000 e-mail backup tapes, and that, of the back-up tapes that could be located, Morgan Stanley expected that "read errors" would render approximately 33% of the e-mail unreadable by computers.  Morgan Stanley advised the SEC that such "read errors" could be attributed to improper handling, poor storage conditions and other unknown factors.

24.    On December 3, 2002, the SEC issued a Cease and Desist Order, filed in Administrative Proceeding No. 3-10957, in which it fined Morgan Stanley $1.65 million for violating Section 17(a)(1) of the Exchange Act by utilizing backup tapes without "adequate systems or procedures in place . . . to retain and/or make accessible" the e-mail that the tapes contained. As set forth in the Cease and Desist Order, Morgan Stanley agreed, within 90 days, to inform the Commission "in writing that it has completed its review and that it has established systems and procedures reasonably designed to achieve compliance with those laws, regulations, and rules concerning the preservation of electronic mail communications." The objective behind the SEC's order was to ensure the preservation of Morgan Stanley's e-mails in a permanent, searchable database and to eliminate Morgan Stanley's ability to sidestep its document production responsibilities.

**D.    Mr. Riel Provides Morgan Stanley With an Operational Archive**

25.    In late 2002, Mr. Riel and his Law IT team finished their design, development and testing work on an e-mail retention system to comply with the SEC's directives. The e-mail retention system (the "Archive") became operational on January 1, 2003, several months ahead of the SEC's March 1, 2003 deadline. The Archive began capturing, in near-real time and in one integrated system, e-mail from January 1, 2003 forward sent to, from or among Morgan Stanley's employees, with the exception of retail brokers (whose e-mail was captured by a different Morgan Stanley IT group) and "Discover Card" employees, who were not regulated by the SEC. The Archive captured over 2 million e-mails every business day, and it grew at the rate of approximately 1.5 terabytes (or 1,500 gigabytes) every month simply from storing new e-mail. As a result, there was no longer any need for Morgan Stanley to use backup tapes for regulatory or litigation e-mail retrieval on a going-forward basis.

26.    In late 2002, due to Mr. Riel's success in designing several software systems for Morgan Stanley and his ability to manage numerous IT projects, his superiors recommended Mr. Riel for promotion to the title of Managing Director. This was the highest position within Mr. Riel's department at Morgan Stanley. Although Mr. Riel's promotion was

approved, Morgan Stanley's Chief Accounting Officer decided that the Company IT Department could not support any new Managing Directors until one or more current Managing Directors left the Department.

27.     In mid-2003, soon after the Archive became operational, and with the help of Galeon Software, an outside vendor located in Spain, Mr. Riel and his Law IT team developed an e-mail inquiry tool to perform searches on the Archive.  Following testing and refinement, Mr. Riel's Law IT team was able to conduct searches for e-mail that had been captured in the Archive.  Searches could be conducted in much the same manner as a search on the Google web site: the searches could be performed by entering "keywords" (e.g., the word "prospectus"); by entering the person(s) or department(s) sending or receiving e-mail; and by selecting time parameters for the search.  This represented a sea change from combing through old backup tapes for e-mails in response to SEC inquiries and litigation requests.   It also saved approximately 97% of the costs that were formerly incurred in harvesting e-mail from tapes.

28.     In the Spring of 2003, James Cusick ("Cusick"), who headed Morgan Stanley's Litigation Department, approached Mr. Riel concerning the 39,000 backup tapes that held Morgan Stanley's pre-2003 e-mail.  None of the pre-2003 e-mail was in the Archive, which captured only new mail.  According to Cusick, it was important to integrate old e-mail from the tapes into the Archive because Morgan Stanley would continue to receive SEC inquiries and litigation requests against that data.

29.     Morgan Stanley's Storage Group was responsible for handling the backup tapes and retrieving the information that they held.  Mr. Riel devised a solution with Hollister and Saunders, who worked in the Storage Group.  Using a vendor known as NDCI, e-mail would be restored from the tapes, duplicate e-mails would be eliminated, and the harvested e-mails would be returned on Super DLT tapes to the Storage Group.  The Storage Group would control the backup tapes and the harvested e-mails that NDCI returned, and it would then prepare the e-mails for eventual uploading into the Archive.  Until the pre-2003 e-mails harvested from the

backup tapes reached the Archive, neither Mr. Riel nor his Law IT team had any access to or control over the tapes or the old e-mails.

30.     As the tape restoration project began, Hollister told Mr. Riel that there were not 39,000 backup tapes, but 35,000 instead.  Hollister explained that after reviewing the tapes, it was discovered that 4,000 did not contain e-mail.

E.     **Mr. Riel Develops the Supervisory E-mail System**

31.     After the Archive became operational and the tape restoration project was underway, Scott Rockoff ("Rockoff"), an in-house lawyer in the Compliance Department of Morgan Stanley's Law Division, requested Mr. Riel and his colleagues to address other SEC requirements that governed the review of e-mail within Morgan Stanley.  The SEC required that supervisors with "Series 24" licenses review a portion of the e-mail that the Morgan Stanley sales and trading staff sent or received from outside the firm.  Morgan Stanley's Institutional Securities Division, however, was not supervising e-mail as required.  Mr. Riel knew that the project was sensitive.  In 2003, the SEC assessed millions of dollars in penalties against Morgan Stanley because it had allowed its investment banking department to exercise undue influence over other areas, such as research.

32.     To create a supervisory function, Mr. Riel and his Law IT team designed a system that instructed the Archive to copy all external e-mail for designated individuals or groups, and then to place randomly selected e-mail into an associated "mailbox," where the sampled e-mail was held for review by supervisors.  The Supervisory E-mail System would create and preserve an "audit record" to track Morgan Stanley's supervisors as they reviewed and deleted e-mail from the mailboxes.  By August 2003, the system that Mr. Riel and his team devised was ready for testing.

33.     To test the Supervisory E-mail System, e-mail samples were routed to several supervisory mailboxes that corresponded to Morgan Stanley's various sales and trading divisions.  At Rockoff's direction, Mr. Riel established an additional mailbox for e-mails sampled from Managing Directors at Morgan Stanley.  Rockoff selected Donald Kempf

("Kempf"), Morgan Stanley's Chief Legal Officer and General Counsel, and Shelley Leibowitz ("Leibowitz") as the two Managing Directors whose mail was to be routed to the additional supervisory mailbox.

34.    Establishing the additional mailbox meant that Rockoff would be supervising e-mail for Morgan Stanley's General Counsel, Donald Kempf – who was Rockoff's ultimate boss.  Mr. Riel asked Rockoff whether Kempf should be contacted for permission to capture his e-mail for supervisory purposes.  Rockoff assured Mr. Riel that this was unnecessary, because Morgan Stanley's policy is that no employee is entitled to any expectation of privacy as far as e-mail is concerned.  Rockoff referred to Morgan Stanley's Code of Conduct, which provides:

> The Firm reserves the right, subject to applicable law, to monitor and review all written and electronic communications that employees send or receive at work or using the Firm's systems, including electronic mail, voicemail, envelopes, packages or messages marked "Personal and Confidential".
>
> * * *
>
> All information stored on or transmitted through the use of the Firm's systems and all recordings and transcripts of telephone conversations are Firm property.  Subject to applicable law, you have no expectation of privacy regarding the use of any of these systems, and you hereby consent to the Firm's access to these areas and records.

In addition, every Morgan Stanley employee is presented with, and is required to acknowledge, a similar message confirming the *lack* of e-mail privacy whenever he or she logs on to any Morgan Stanley computer.  This resolved Mr. Riel's concerns with respect to his review of e-mails.

35.    As testing of the E-Mail Supervisory System continued, it became clear that Morgan Stanley had yet to develop policies to govern access to e-mails.  The E-Mail Supervisory System captured e-mails that were clearly inappropriate, or that involved Morgan Stanley employees interviewing for new jobs outside the company.  Morgan Stanley had no policies concerning "privacy boundaries" for such e-mails, or the review and treatment of such e-mails.

11

36.     Testing the Supervisory E-mail System revealed a delay before an individual's e-mails became available for review.  Rockoff requested Mr. Riel to designate two more Morgan Stanley Managing Directors so that he could track the time lag.  Mr. Riel added Michael Bodson ("Bodson") and Guy Chiarello ("Chiarello") to the supervisory "mailbox."  Mr. Riel had previously worked with Bodson.  Mr. Riel had also worked with Chiarello, who was then Chief Technical Officer and Chief Information Officer of Morgan Stanley's Institutional IT Department.

37.     When Mr. Riel checked the supervisory mailbox for Bodson's and Chiarello's e-mails, he determined that one day elapsed before their e-mail appeared.  However, the "subject" lines in several e-mails to and from Chiarello were immediately suspicious.  One message was clearly a solicitation by Chiarello for sports tickets from one of Morgan Stanley's vendors.  Other messages appeared to be gift solicitations by Chiarello, or offers from vendors.

38.     Mr. Riel and his Law IT team completed and launched Morgan Stanley's Supervisory E-mail System for the Equities and the Investment Banking Divisions in October, 2003.  In the meantime, Mr. Riel was bothered by what he had seen in Chiarello's e-mails.

**F.     Mr. Riel Discovers that Chiarello Improperly
Solicited Gifts From Morgan Stanley Vendors**

39.     In November 2003, disturbed by what he had seen in Chiarello's e-mail, Mr. Riel instructed the Archive to pull Chiarello's e-mail for several dates in September and October 2003.  Even in this limited time frame, Mr. Riel saw several gifts from Morgan Stanley vendors to members of Chiarello's family.  Mr. Riel also saw e-mails in which Chiarello solicited gifts from Morgan Stanley's vendors.

40.     Mr. Riel believed that accepting gifts for family members and soliciting gifts violated Morgan Stanley's Code of Conduct, as well as an SEC order concerning conflicts of interest at Morgan Stanley, because this practice undermined objective business decisions to serve Morgan Stanley's clients and shareholders.  Upon information and belief, Morgan Stanley was also under SEC investigation for additional conflicts of interest between awarding business

to vendors in return for investment banking relationships. Chiarello's e-mails in September and October 2003 showed improper conduct and conflicts of interests because they included the following:

    (a)    A vendor offered to employ a catering business operated by Chiarello's family at one of its events.

    (b)    The same vendor offered football tickets for Chiarello's family. Chiarello requested better seats from the vendor, implying that his wife and daughter would not attend if their seating was not improved.

    (c)    A vendor offered to provide New York Rangers tickets to Chiarello and his family.

    (d)    Other e-mails showed that Chiarello solicited EMC, a Morgan Stanley vendor, for tickets to the World Series. At the time, EMC was both a banking client of Morgan Stanley and a provider of storage devices to Morgan Stanley's Institutional IT department. In response to EMC's offer of playoff game tickets, Chiarello wrote: "Just take care of us for the World Series."

    (e)    EMC offered to let Chiarello and his son the use the seats held by EMC's CEO at a Jets-Miami football game. Chiarello accepted the tickets.

    41.    In the same time frame, Chiarello's e-mail contained additional offers from various Morgan Stanley vendors, including the following:

    (a)    AT&T, another Morgan Stanley vendor, offered sports events tickets to Chiarello and Richard Anfang, a Morgan Stanley officer.

    (b)    AT&T offered US Open tickets for Chiarello's wife and daughter.

    (c)    Verisign offered World Series tickets to Chiarello.

    (d)    Reuters offered Chiarello tickets for playoff game #7 between the New York Yankees and the Boston Red Sox.

    (e)    Accenture also offered baseball tickets to Chiarello.

    42.    It was obvious to Mr. Riel that Chiarello's conduct violated prior SEC rulings and Morgan Stanley's Code of Conduct. The Code provided, in pertinent part:

    Do not use the Firm's premises, assets, information or influence for personal gain.

* * *

Avoid any activity, interest or association outside the Firm that could impair your judgment or interfere with, or give the appearance of interfering with, your responsibilities on behalf of the Firm or its clients.

* * *

You and your family members may not accept gifts or special favors (other than of nominal value) from any person or organization with which the Firm has a current or potential business relationship.

**G.      Mr. Riel Discovers Conflicts of Interest in an Industry Leadership Award**

43.      Since 1990, Morgan Stanley has sponsored a "Computerworld Leadership Award," which is bestowed annually at a dinner held in the Smithsonian Museum. Chiarello's e-mail in September and October 2003 showed that Morgan Stanley attempted to influence the selection of the Leadership Award recipient in order to benefit its relationships with current or prospective vendors and customers.

44.      In 2003, Morgan Stanley was competing against other investment companies to handle Google's IPO, which was expected to be among the largest and most successful IPOs in recent years. Chiarello's e-mails showed that one of his direct reports had a seat on the Computerworld Board, and could determine the nominee or influence the selection process so that Eric Schmidt, Google's CEO, would be nominated for the 2004 award.

45.      Chiarello's e-mails further disclosed that Google's CEO did not want the nomination. In the end, Joseph Tucci, CEO of EMC, another Morgan Stanley vendor and customer, was nominated and presented with the award. In reality, Tucci was Morgan Stanley's third or fourth choice.

46.      Chiarello's e-mail showed other conflicts of interest. Chiarello requested a salesman at Cisco to wire a new house that Chiarello was building in New Jersey. The salesman agreed to Chiarello's request. At that time, Morgan Stanley conducted a significant amount of business with Cisco – and Cisco was competing for additional work from Morgan Stanley. Chiarello's e-mails also suggested that he was trading Morgan Stanley's orders for products or services in exchange for the vendors' banking business. In one e-mail, a senior

Morgan Stanley banker provided Chiarello with a list of companies from whom he required banking business, complete with prioritization.

47.    At the end of 2003, Morgan Stanley gave Mr. Riel a stellar performance review and rewarded him with generous pay and bonus increases.  This was the result of Mr. Riel's success in delivering an operational and searchable Archive, a reliable Supervisory E-mail System and a large number of other projects.  Nevertheless, the improprieties that Mr. Riel had seen in Chiarello's e-mail continued to bother him.

**H.    Mr. Riel Receives Information Concerning Overwriting and Destruction of E-mails, and the Quantity of E-mails Available for Review**

48.    After the Storage Group within Morgan Stanley's Institutional IT Division began the tape restoration process, Mr. Riel received updates in September 2003 which showed that a large number of backup tapes contained no e-mail.  When Mr. Riel followed up on this information, he learned that Morgan Stanley had overwritten approximately 20% of its backup tapes, causing a total loss of the information that they contained.  The recycling occurred despite the SEC's 2001 order directing Morgan Stanley to cease all recycling; despite the fact that Morgan Stanley's compliance department also ordered IT to stop recycling tapes; and despite the SEC's 2002 Cease and Desist Order.

49.    In June 2002, Morgan Stanley had advised the SEC that "read errors" from its backup tapes would render approximately 33% of the tapes unreadable.  In late 2003, however, after the Storage Group within Morgan Stanley's Institutional IT Division began the tape restoration process, Mr. Riel learned that the actual "read error" rate was a relatively low 8%.  The new information was at odds with the earlier data that Morgan Stanley provided to the SEC.  The lower "read error" rate meant that -- for backup tapes that Morgan Stanley had not destroyed through recycling -- the tape restoration project would yield at least twice the amount of pre-2003 e-mail for SEC review.

**I.    Mr. Riel Reports the Improper Gift
       Solicitations and the Overwriting of E-mail Tapes**

50.    Mr. Riel took steps to advise his superiors at Morgan Stanley of the developments in the tape restoration process and the contents of Chiarello's e-mails.  Morgan Stanley's Code of Conduct contains several provisions that require employees to advise their superiors whenever they uncover improper conduct or wrongdoing.  For example, the Code provides:

> The Firm's reputation for integrity depends upon your conduct.  You are the Firm's first line of defense against civil or criminal liability and unethical business practices.
>
>                    * * *
>
> [I]f you observe or become aware of any illegal or improper conduct on the part of another employee or consultant, supplier, client, counterparty or other third party, you must communicate that information to your direct supervisor and, if appropriate or necessary, to Corporate Security, a more senior manager or the Director of Compliance, to make certain the situation will be addressed.
>
>                    * * *
>
> Unless responsible Firm management learns of a problem, the Firm cannot deal with it appropriately.

In addition, in or about late 2003 or January 2004, Morgan Stanley updated its procedures for reporting unethical conduct or wrongdoing within the Firm.  The new procedures permitted employees to report such matters anonymously.  Based on the nature of the e-mails he had found, reflecting improper conduct by senior executives, the possibility of retaliation was a very real concern for Mr. Riel, and he proceeded anonymously.

51.    In mid-January 2004, Mr. Riel made copies of the e-mails from Chiarello's file, which contained the improprieties described above in Paragraphs 39-41 and 43-46.  Mr. Riel sent the e-mails to Stephen Crawford ("Crawford"), Morgan Stanley's CFO, by interoffice mail. Mr. Riel selected Crawford because, as Morgan Stanley's CFO, Crawford had significant responsibilities under the new Sarbanes-Oxley Act.  As he left work on the evening of January 15, 2004, Mr. Riel put the materials, addressed to Mr. Crawford, in an inter-office envelope,

which he placed in the inter-office mail bin at Morgan Stanley's offices at 750 Seventh Avenue in Manhattan.  At the time, Mr. Crawford's office was at 1585 Broadway, and inter-office mail was delivered regularly between these two Morgan Stanley locations.  On top of the packet of e-mails (and inside the inter-office envelope) Mr. Riel wrote the words "Needs investigation" on a yellow post-it note.

52.  Mr. Riel retained a copy of the documents that he forwarded to Crawford. He continued to add to those materials over the following months with other, similarly suspicious e-mails that he downloaded from the Archive.

53.  Mr. Riel's inter-office package to Crawford moved with the inter-office mail on Friday, January 16, 2004.  Upon information and belief, the package reached Crawford's office late in the day on Friday, January 16, or on Tuesday, January 20, 2004, after Morgan Stanley (and the stock exchanges) re-opened following the Martin Luther King holiday.

54.  Morgan Stanley's e-mails show that Crawford reacted swiftly to Mr. Riel's packet of e-mails.  On Tuesday evening, January 20, 2004, Chiarello sent an e-mail to Kevin Nennecke, Morgan Stanley's Executive Director of E-mail Engineering, and to George Sherman ("Sherman"), head of Morgan Stanley's IT Security Department.  Chiarello wrote as follows:

> Unfortunately Steve [Crawford] is over the edge on e-mail on a number of fronts.  The combination of the raw amount of emails he gets and in this instance the amount of junk, spam/crude **mail** combined with the regulatory issues **with the stuff that people send him** seems to have put him over the edge today.  (Emphasis added).

Chiarello requested Nennecke's and Sherman's help before 10 a.m. the following day.

55.  On January 21, 2004, Chiarello sent another e-mail to Sherman.  Chiarello wrote:

> His [Crawford's] main issue is that he gets too many e-mails that put him in a disadvantaged reguatory [sic] position.  He does not get most of it **yet he has no deniability that he received it . . . and much of it could create personal and statutory liability. A tricky problem for ceo's and cfo's right now** . . . . (Emphasis added).

56.   On January 28, 2004, Crawford received a new e-mail address at Morgan Stanley with a different variation of his name.  Crawford's new e-mail account was inaccessible to all Morgan Stanley employees except those from a prescribed list of senior officers.  On the same day, acting on specific instructions from senior management, Morgan Stanley's IT executives deleted the e-mail account of Morgan Stanley's CEO, Philip Purcell, from the Morgan Stanley e-mail system.

57.   Approximately two weeks later, Mr. Riel followed up on his growing concerns that arose from the tape restoration process.  On February 6, 2004, Mr. Riel sent an e-mail to Cusick, who headed the Litigation Department of Morgan Stanley's Law Division, and Soo-Mi Lee ("Lee"), another in-house lawyer in the same department, to advise them about the significantly lower error rate and its consequences.  Mr. Riel's e-mail warned Cusick and Lee that a regulatory issue existed because the Archive could potentially contain more than twice the e-mail bearing on SEC-related topics than what Morgan Stanley originally disclosed to the Commission.  In addition, Mr. Riel's e-mail informed Cusick and Lee that a large number of backup tapes were being recycled in violation of the SEC's prior orders.

**J.   Morgan Stanley Disregards Mr. Riel's Warnings and Investigates Mr. Riel Instead**

58.   Upon information and belief, Morgan Stanley failed to investigate the improper recycling of backup tapes and the higher yield in the tape restoration process, and failed to bring those matters to the SEC's attention.  Nor did Morgan Stanley investigate the matters contained in Chiarello's e-mail.  Instead, Morgan Stanley surreptitiously investigated Mr. Riel for raising those issues.

59.   In mid-February 2004, following President's Day weekend, Mr. Riel learned that his own e-mail was being requisitioned and investigated.  As Mr. Riel reviewed a log of searches conducted on the e-mail Archive, which he did routinely as part of Archive maintenance, he found four searches titled "ITSEC_Inquiry1" through "ITSEC_Inquiry4" – which meant IT Security, Inquiries 1-4.  These searches stood out because they utilized a different naming convention than Mr. Riel's Law IT Department normally used.  One of the

searches requisitioned all of Mr. Riel's e-mail from the Archive for early 2004. A member of Mr. Riel's IT team also admitted to Mr. Riel that he had been requested to run the inquiry in a manner designed to prevent Mr. Riel from learning about it. Chiarello, who was the subject of the materials that Mr. Riel sent to Crawford, ordered the investigation of Mr. Riel's e-mail.

60.     At the same time that Mr. Riel's e-mail was being searched, Chiarello was involved in a series of exchanges with Joanne Ceriello (and Executive Director in Morgan Stanley's HR Department) and Sherman (who headed Morgan Stanley's IT Security Department) concerning this search. On February 10, 2004, Ceriello wrote to Chiarello concerning the "potential liability" to Morgan Stanley that "resided in her shop." This was a reference to Shelly Leibowitz, who headed Morgan Stanley's Company IT Department, and who was Mr. Riel's supervisor at the time. Chiarello's e-mail reply was that he already had Sherman on the case. On February 13, 2004 – the same day that one of Mr. Riel's colleagues was requested to search the Archive for Mr. Riel's e-mail -- Chiarello pressed Sherman to see if the e-mail inquires had yielded any answers. Sherman responded that maintenance was being performed on the Archive over the weekend, and he asked to be notified if "you want this to be pushed harder." On February 18, 2004, Mr. Sherman sent an e-mail to advise Chiarello that another employee, Aldo Greyez, was dialing into the Archive from his vacation. Upon information and belief, Greyez reviewed the results of the e-mail searches while he was on vacation.

61.     In early April 2004, Chiarello summoned Mr. Riel to a meeting, and told Mr. Riel that Morgan Stanley's senior management had grown concerned about a collection of e-mail which had surfaced from the Archive and which could embarrass the company. Chiarello asked Mr. Riel whether anyone could conduct a search of the Archive without Mr. Riel knowing about it. Mr. Riel replied that it could not be done, and he told Chiarello that he knew about the inquiry that IT Security conducted of his own e-mail in February 2004. Chiarello assured Mr. Riel that the whole matter was "water under the bridge" and that there was much work to be done. Chiarello's reference to the "collection of e-mail" meant the packet of e-mail that Mr. Riel sent to Crawford in January 2004. This reference permitted only one conclusion: after Crawford

received a packet of e-mails from Mr. Riel, Crawford forwarded the materials to Chiarello and gave him the latitude to address the matter as he saw fit. Morgan Stanley thus provided the incriminating file to the individual who should have been the subject of a legitimate investigation.

**K.      Testing the Archive and Accessing E-mails Through**
**The Archive Become Part of Mr. Riel's Responsibilities**

62.     Mr. Riel and the other members of his Law IT team tested the Archive every day to ensure that it was functioning properly.  Testing was required for several reasons: <u>First</u>, by mid-2004, Mr. Riel's Law IT Department was receiving up to 20 requests per day from Morgan Stanley's Litigation Department and Compliance Department to conduct e-mail searches on the Archive for production purposes in various litigations, for inquires from the SEC and from other government agencies, and for internal investigations.  Testing the Archive was important to ensure that any search performed on the Archive would recover all of the requested materials. <u>Second</u>, as the Archive captured new e-mails, and as older e-mails were added from Morgan Stanley's back-up tapes, the Archive grew rapidly.  A separate department within Morgan Stanley's Institutional IT Department was responsible for obtaining additional storage space for the Archive and for Morgan Stanley's other IT needs.  It often failed to do so, which created frequent shortages in the Archive's storage space. Daily tests of the Archive were required to make sure that the Archive's inquiry and retrieval systems could always access the specific servers and storage areas in which Morgan Stanley's archived e-mails were saved.

63.     As part of the testing process, Mr. Riel and other members of his Law IT team routinely conducted searches of each others' e-mail accounts at Morgan Stanley.  They also routinely conducted searches of e-mails in other Morgan Stanley cost centers and departments. This routine testing was essential to ensure that the Archive was functioning properly.  When any search recovered e-mail, the captured e-mail was called a "result set" that consisted of a series of Web-based links to the actual e-mail captured by the search.  Mr. Riel and his colleagues routinely "clicked" on the links and opened up the e-mail to make sure that the search functioned

according to its parameters and that the link opened properly. This entailed reading others' e-mail on a daily basis. Only when Mr. Riel's Law IT team could request, capture and open e-mail would it be confident that the Archive was functioning properly.

64. Senior lawyers in Morgan Stanley's Litigation Department and Morgan Stanley's Compliance Department were aware, ever since the Archive became searchable in May 2003, that Mr. Riel and his Law IT team routinely opened and read others' e-mail in connection with Archive searches and testing. This was necessary to verify that each search returned a functioning "result set," and that the links in the "result set" would, in turn, open responsive e-mails. The lawyers who requested the search would not be advised that the search had been run successfully until a "result set" was obtained and a sample of the result set was opened and read.

65. In a gradual transition in the late winter and early spring of 2004, Moira Kilcoyne ("Kilcoyne") began to assume control of the Company IT Department from her predecessor, Shelley Leibowitz. Mr. Riel met regularly with Kilcoyne and briefed Kilcoyne on the architecture and the functioning of the Archive and the steps that he and his Law IT team took regularly to test the Archive and to review the accuracy of the searches performed on Morgan Stanley's company-wide e-mail with the use of the Archive.

66. Upon information and belief, Kilcoyne was unfailingly loyal to Chiarello. Beginning in May 2004, Kilcoyne assumed full control of Company IT and became Mr. Riel's supervisor. Shortly thereafter, Kilcoyne summoned Mr. Riel to a meeting, at which she demanded information concerning Mr. Riel's relationship with Galeon Software, an outside vendor that supplied software for the Archive and the Supervisory E-mail System. Kilcoyne stated that there was "a lot of noise" concerning Mr. Riel's relationship with the vendor, and that Mr. Riel's "objectivity was in question." In reality, Riel had no conflict of interest with Galeon Software, and that company had successfully completed many projects for Morgan Stanley at relatively low cost. Kilcoyne's accusations were unfounded and part of a larger strategy orchestrated by Chiarello and others to undermine Mr. Riel's position and his credibility at Morgan Stanley.

**L.**     **The Coleman Litigation Heats Up Over Morgan Stanley's Production of E-mails**

67.     In June 2004, Morgan Stanley sought to involve Mr. Riel in a lawsuit entitled <u>Coleman (Parent) Holdings, Inc. v. Morgan Stanley & Co., Inc.</u>, Case No. 502003CA005045XXOCAI, pending in the 15th Judicial Circuit Court in Palm Beach County, Florida (the "Coleman Litigation").  In that lawsuit, Coleman (Parent) Holdings ("Coleman"), controlled by Ronald Perelman, the Chairman of Revlon Inc. and a well-known financier, sued Morgan Stanley for fraud in connection with Coleman's purchase of Sunbeam Corporation.  As alleged in the Coleman Litigation, Morgan Stanley acted as Sunbeam's investment banker, knew that Sunbeam had engaged in accounting fraud, and deliberately failed to reveal that information to Coleman.

68.     By early 2004, Coleman sought discovery of Morgan Stanley's e-mails dating back to 1998, when the events giving rise to the litigation transpired.  Morgan Stanley objected to that production, and protested that it would require "a massive safari into the remote corners" of its backup computer systems.

69.     On April 16, 2004, the Florida Court issued an order ("the Agreed Order") that required Morgan Stanley to conduct a thorough and presumably final search of its e-mail; to produce all responsive materials by May 16, 2004; and to certify, in writing, its compliance with the Agreed Order.

70.     Morgan Stanley's lawyers provided Mr. Riel's Law IT team with the parameters for the e-mail search required by the Agreed Order.  Members of Mr. Riel's Law IT team ran a search on the Archive.

71.     In the meantime, within the Institutional IT Department, the Storage Group that Saunders headed was still engaged in harvesting e-mails from Morgan Stanley's 35,000 backup tapes for eventual inclusion into the ever-growing Archive.  The Storage Group had been in charge of this process since 2003, after the Archive became functional.  It was the Storage Group which interfaced with NDCI, the outside vendor that restored the e-mails, eliminated duplicate messages and returned the culled e-mail messages on "SDLT" tapes to the

Storage Group. The Storage Group then arranged for the data to be entered on a disk for Mr. Riel's Law IT team so that it could be uploaded into the Archive. Until that occurred, Mr. Riel's Law IT team had no access, control or responsibility for the backup tapes or the harvested e-mail data. Nor could Mr. Riel's Law IT team use the Archive to run a search on any backup tapes.

**M.    Morgan Stanley Discovers Additional E-mail Backup Tapes, Potentially Subject to Production in the Coleman Litigation**

72.    Several weeks before Morgan Stanley was to make its May 2004 production in the Coleman Litigation, the Storage Group became aware of an additional 1,423 "DLT" backup tapes that were found in a Morgan Stanley facility in Brooklyn. The amount of data in the 1,423 Brooklyn tapes was potentially enormous. Upon information and belief, the tapes could contain millions of unique pre-2000 e-mail messages. Morgan Stanley had also located even older tapes, compiled in an 8-millimeter format. The Storage Group forwarded the Brooklyn tapes and the 8-millimeter tapes to NDCI for processing.

73.    Morgan Stanley's lawyers produced e-mail to Coleman on or about May 16, 2004. In violation of the Agreed Order, Morgan Stanley failed to certify that it had complied with the Florida Court's instructions, and failed to certify that its production was complete. Coleman pressured Morgan Stanley to produce a certification and, by early June 2004, Morgan Stanley's lawyers knew that they would be required to comply.

74.    On June 7, 2004, Mr. Riel sent an e-mail to Cusick, who headed Morgan Stanley's Litigation Department, and to Lee, another in-house lawyer. Mr. Riel's e-mail, dated June 7, 2004, alerted them that the Brooklyn tapes could contain e-mail. Mr. Riel wrote as follows:

> The storage folks found an additional 1600 backup tapes in a closet. We are not sure if they have e-mail on them, but it is expected that they predate 1/2000. Unless you say otherwise, I have told the storage team to process them like the other backup tapes (i.e. dump them, screen for e-mail, dedupe the email, and give it to us). I will inform you if any pre-2000 e-mail tapes are found in this batch.

75.    Mr. Riel's June 7, 2004 e-mail put Morgan Stanley's Litigation Department on notice that the 1,423 tapes located in Brooklyn and the older 8mm tapes could contain e-mail.  Morgan Stanley's production in the Coleman Litigation had occurred only three weeks earlier.  Upon receiving Mr. Riel's June 7 e-mail, Morgan Stanley's Litigation Department could have taken appropriate steps to supplement its production or advise the Florida Court. Instead, Morgan Stanley chose to create the false impression in the Coleman Litigation that discovery was complete.

76.    On or about June 23, 2004, Morgan Stanley's lawyers prepared a Certification of Compliance (the "Certification") with respect to its production in the Coleman Litigation – which should have been submitted over a month earlier.   Upon information and belief, James Doyle ("Doyle"), a lawyer in Morgan Stanley's Litigation Department, prepared the Certification.  Initially, Doyle requested Anush Danilyan, a junior member of Mr. Riel's IT team who performed data entry functions, to sign the Certification.  Ms. Danilyan had neither the experience nor the understanding to sign the Certification and, upon information and belief, Doyle knew this. Ms. Danilyan brought the Certification to the attention of her supervisor, who examined it and then brought it to Mr. Riel.

77.    Mr. Riel had no specific information concerning the Coleman Litigation and only general information concerning the search that his Law IT team conducted on the Archive.  Nor did Mr. Riel, who is not a lawyer, have any understanding of Morgan Stanley's discovery obligations in the Coleman Litigation.   Mr. Riel believed that the Certification operated as a confirmation that Morgan Stanley conducted a search of its Archive and that the responsive materials from that search were forwarded to Morgan Stanley's lawyers for production.

78.    At the time, Mr. Riel had no understanding that he was certifying, in any sense, that *all* responsive e-mail from *any* Morgan Stanley source, including older back-up tapes, had been produced.  Neither Mr. Riel nor anyone on his Law IT team could have made any such certification.  As Morgan Stanley's Litigation Department and its Storage Group knew, only the

24

Storage Group possessed and controlled the unprocessed tapes for pre-2003 e-mail.  Only the Storage Group could certify whether all possible tapes were located, processed or examined.  Mr. Riel's Law IT team could attest *only* to the operations that it performed on the Archive with harvested e-mail that was already loaded into the Archive.  Morgan Stanley's Litigation Department and its outside counsel understood this – but did nothing to advise the Court in the Coleman Litigation.  Instead, Morgan Stanley's lawyers served and filed Mr. Riel's Certification.

79.    On July 2, 2004, nine days after he signed the Certification, Mr. Riel learned that the Brooklyn tapes and the 8-millimeter tapes contained e-mail which, in some instances, dated back to 1998.  An e-mail that Mr. Riel received from NDCI on July 2, 2004 stated as follows:

> We looked at the "found" tapes we were able to restore and 90 of them had mail.  We got the label (internal) off 4 of them and the dates are 5/12/99, 5/14/99, 8/03/99, and 2/18/01.  Obviously there is pre 2000 mail.

> We also catalogued 2 of the 8mm test tapes we have and the dates on those are 6/16/98 and 6/798 so again there is pre 2000 mail there.

80.    On July 6, 2004, Mr. Riel's Law IT team issued an e-mail to Morgan Stanley's Law Division to alert the in-house lawyers that the Brooklyn tapes and the 8-mm. tapes contained e-mail.  Two days later, on July 8, 2004, Mr. Riel presented the same facts directly to the in-house lawyers in the Compliance Department of Morgan Stanley's Law Division.  Mr. Riel's presentation referred to the Brooklyn tapes and stated, in pertinent part:

> Notes: All tapes in the original project have been archived.  Currently working on 1600 additional tapes.

> 7/01/04:  1600 discovered tapes have different format from others, vendor had to modify code.  We'll start receiving data from tapes the week of 7/5.

81.    Mr. Riel's e-mails and his presentations to Morgan Stanley's Law Division placed Morgan Stanley at a crossroads with respect to the Coleman Litigation, and with respect to Mr. Riel.  Morgan Stanley could inform Coleman and the Florida Court that there was

a significant quantity of additional materials to produce – or it could suppress that information, as well as access to those who knew.  Morgan Stanley chose the latter course and attempted to make Mr. Riel its scapegoat.

**N.     As the SEC Investigates and Pressure Mounts in The Coleman Litigation, Morgan Stanley Uses "Administrative Leave" to Sideline Mr. Riel**

82.     Upon information and belief, Morgan Stanley's in-house lawyers realized that Mr. Riel's signature on the Certification would draw significant scrutiny in the Coleman Litigation.   Morgan Stanley believed that, given Mr. Riel's knowledge of the Archive, the backup tapes and the recently discovered Brooklyn tapes, any deposition of Mr. Riel would be risky.  Morgan Stanley also concluded that it was Mr. Riel who discovered and disclosed the improper dealings and conflicts of interest between Chiarello and the company's vendors and customers.

83.     In addition, between February and August 2004, the SEC began a series of inquires at Morgan Stanley concerning "e-mail production," "e-mail restoration process," and "e-mail searches."  These were precisely the matters that Mr. Riel raised in his February 2004, his June 2004 and in his July 2004 e-mails to Morgan Stanley's Law Department.  Mr. Riel's earlier warnings concerning:  (a) the overwriting and destruction of thousands of e-mail back-up tapes; and (b) the existence of twice the amount of e-mails available for review, amounted to a regulatory minefield for Morgan Stanley – and the damage would be compounded if Mr. Riel's e-mails or the SEC's inquiries were disclosed in the Coleman litigation.  Faced with two SEC investigations, an increasingly inquisitive SEC and Mr. Riel's prior e-mails, Morgan Stanley believed during the Summer of 2004 that Mr. Riel was acting as a whistleblower.

84.     Morgan Stanley's Law Department knew of the SEC's inquiries into the company's e-mail retention practices.  So did Kilcoyne, who was Mr. Riel's supervisor, and who headed the Company IT Department, which ultimately controlled the e-mail Archive.  As a result, Mr. Riel became *persona non grata* among Morgan Stanley's top IT executives and other executives.  Discharging Mr. Riel, however, would risk deeper inquiry from the SEC and other

adverse consequences. Mr. Riel would be free to speak with others in the industry and with the media. If he were to be contacted by the SEC, or by Coleman, then Morgan Stanley would not know it and could not control it.

85.    Morgan Stanley determined to place Mr. Riel on "administrative leave" instead, with full pay and benefits. Morgan Stanley contrived the means to place Mr. Riel on "administrative leave" after routine Archive testing yielded improper e-mails involving Moira Kilcoyne, Mr. Riel's supervisor.

86.    In 2004, Mr. Riel and his Law IT team ran e-mail searches on the Archive in connection with a high-profile gender discrimination litigation, entitled EEOC and Schieffelin v. Morgan Stanley & Co., Inc., et al., 01 Cir. 8421 (RMB), in the United States District Court for the Southern District of New York, which Morgan Stanley settled for approximately $54 million in July 2004. As part of document production in the Schieffelin litigation, Mr. Riel's Law IT department ran e-mail searches on the Archive for various terms (known as "keywords") that were insulting or demeaning to women. These "keyword" searches included searches for pornographic words that appeared within e-mail at Morgan Stanley.

87.    During the summer of 2004, Mr. Riel's Law IT team tested the Archive by utilizing some of the same "keyword" searches that were used in the Schieffelin litigation. One such "keyword" was a search for the word "porn." This term and others from the Schieffelin litigation were tested across various Morgan Stanley cost centers and departments, including, on occasion, the Company IT Department.

88.    In or about July 2004, a search that the Law IT Department ran using a list of "keywords" that included "porn" captured two e-mails involving Kilcoyne. Mr. Riel reviewed the first of the two e-mails to verify that the search function was operating, but he did not see the word "porn" or any of the "keywords" in the e-mail. He notified his colleagues that there was an issue with the Archive's inquiry tool, and instructed that the problem was to be fixed.

89.    Later on the same day, Timothy Hom ("Hom") and John Carter, two project management officers, were in Mr. Riel's office when two members of his Law IT team

interrupted to show Mr. Riel that Kilcoyne's e-mails indeed contained words from the list of search terms. E-mail exchanges between Kilcoyne and Rora Tanaka, another Morgan Stanley employee, showed that in a "P.S." at the end of the e-mail, they wrote about attending a pornography convention in Las Vegas. In another e-mail, they discussed the size of another Morgan Stanley employee's genitalia. This discussion generated laughter among everyone in Mr. Riel's office.

90.    In early August 2004, while Mr. Riel was on vacation, Hom used what he had witnessed in the hopes of improving his position at Morgan Stanley. Hom reported to Kilcoyne that Mr. Riel was viewing e-mails of other Morgan Stanley employees. This became the pretext for the "administrative leave" that Morgan Stanley imposed upon Mr. Riel.

91.    On August 18, 2004, Mr. Riel was summoned to a meeting with Kilcoyne, his supervisor. A Morgan Stanley HR officer, Tara Favors, also attended. Rather than address the improper conduct that Mr. Riel brought to Morgan Stanley's attention, Mr. Riel himself was made the focus of the meeting. Kilcoyne asked Mr. Riel whether he had been looking at the e-mail of senior Morgan Stanley officers without the authorization of Morgan Stanley's Law or Compliance Departments. Mr. Riel replied, truthfully, that this was not the case. Ever since testing began on the Archive and the E-Mail Supervisory System – and after those systems became operational – the Litigation Department and the Compliance Department knew and understood that it was routine for Mr. Riel and members of his Law IT Department: (a) to run searches on the Archive for litigation and regulatory matters that involved or captured e-mail to and from senior Morgan Stanley personnel; (b) that Mr. Riel and his Law IT team tested the Archive and E-Mail Supervisory System regularly, and that they examined the results of their searches; and (c) that tests and inquiries run on the Archive and E-Mail Supervisory System routinely captured e-mails across several Morgan Stanley departments and all ranks of Morgan Stanley employees and officers. In addition, Kilcoyne knew that because Mr. Riel was the architect of the Archive and the Supervisory E-mail System, reviewing e-mails was part of his responsibilities.

92.     Mr. Riel was advised that he would be placed on "administrative leave," with full pay and benefits, while his own conduct was investigated.  Kilcoyne revoked Mr. Riel's access to Morgan Stanley's computer system and the Archive while the "investigation" proceeded.

93.     On the same day, Morgan Stanley cut off all members of Mr. Riel's Law IT team from access to the Archive.  In addition, Morgan Stanley terminated its relationship with Galeon Software, the vendor that developed most of the software tools for the Archive.  In all, Morgan Stanley discharged or severed its business relationship with more than 30 individuals who possessed a thorough understanding of the Archive.  As a result, Morgan Stanley purged itself of:  (a) every individual who understood the structure of the Archive; (b) every individual who could utilize the Archive in the manner that Mr. Riel had done to uncover wrongdoing within Morgan Stanley; and (c) every individual who readily understood the limitations in the Archive and its content at the time that Morgan Stanley made its incomplete production in the Coleman Litigation and in other pending matters.

**O.      Morgan Stanley Immediately Investigates Mr. Riel as a "Whistleblower"**

94.     Morgan Stanley regarded Mr. Riel as a whistleblower at the time it placed him on "administrative leave."  On August 18, 2004, the same day as Mr. Riel's "administrative leave" began, Joanne Ceriello, an Executive Director in Morgan Stanley's HR Department who works closely with Chiarello, instructed Morgan Stanley's IT Security Department to begin a forensic examination of Mr. Riel's computer.  The IT Security Department conducted its forensic investigation by running "keyword" searches in much the same manner as Mr. Riel's Law IT team searched the Archive.  In this instance, Morgan Stanley's HR department, and Ceriello in particular, provided the list of "keyword" searches, which included the following terms:

> "kilcoyne"
> "documentum"
> "accenture"
> Stephen.Crawford@MorganStanley.com

"vendor"

"license"

"deal"

"contract"

"SEC"

"Knicks"

"Yankees."

These are, in most instances, the same topics that Mr. Riel implicated in the packet of e-mails that he forwarded to Stephen Crawford, Morgan Stanley's then–CFO, on January 15, 2004.

95.    On August 19, 2004, one day after placing Mr. Riel on "administrative leave," Tara Favors and another Morgan Stanley employee conducted a search of Mr. Riel's computer and his office between 6:45 p.m. and 7:30 p.m.  Favors advised Kilcoyne of the search, and forwarded a transcript that she had prepared of the previous day's meeting with Mr. Riel.  In addition, at approximately 7:30 p.m., as she finished her search of Mr. Riel's office, Favors sent Kilcoyne an e-mail in which she advised Kilcoyne that there are "no specific Whistleblower Policies – although we [Morgan Stanley] act in accordance with the Sarbanes–Oxley Act . . . ." Favors also included information concerning a hotline that Morgan Stanley established "pursuant to recently effective Sarbanes-Oxley requirements."

96.    On August 25, 2004, Tara Favors requested Anush Danilyan, a junior member of Mr. Riel's Law IT Department, to run a search on the Archive for the "pornographic" e-mail that Kilcoyne received, and which was later brought to Mr. Riel's attention.  However, Morgan Stanley conducted a far different search through Mr. Riel's e-mails.  On August 25, 2004, the very same day, John Durko, another employee in Morgan Stanley's IT Security Department, searched the Archive for all of Mr. Riel's e-mail for the period January 1, 2004 - February 29, 2004.  This was the same period of time during which Mr. Riel sent his packet of e-mails to Crawford.

97.    On September 10, 2004, Mr. Riel met with Mark Greenfield ("Greenfield"), an in-house lawyer in Morgan Stanley's HR department, and Joanne Ceriello.

Mr. Riel advised Greenfield of the e-mails in Chiarello's file, and he provided Greenfield with various materials, which included the documents that Mr. Riel forwarded to Crawford in January 2004. In addition, Mr. Riel told Greenfield about Morgan Stanley's improper recycling of its backup tapes and other regulatory issues that could be implicated by the low "read error" rate in the tape restoration process.

98. Approximately one month later, Mr. Riel was requested to attend a meeting with Morgan Stanley's outside counsel and Zachary Stern ("Stern"), a Morgan Stanley in-house lawyer. Mr. Riel provided the lawyers with the same facts that he previously related to Greenfield. By this time, Morgan Stanley's investigation of Mr. Riel was substantially complete.

**P.   Mr. Riel Provides Information to the SEC**

99. In mid-October 2004, approximately two months after Morgan Stanley placed Mr. Riel on "administrative leave," the SEC contacted Mr. Riel at home. At the SEC's request, Mr. Riel provided the SEC with information concerning, among other things, the lower "read error rates" from Morgan Stanley's tape restoration project, and the additional tapes containing e-mail that were found at Morgan Stanley's Brooklyn facility and other locations. Mr. Riel also advised the SEC that, as NDCI determined, a large number of backup tapes containing e-mail had been recycled and overwritten at Morgan Stanley. At the SEC's request, Mr. Riel supplied the SEC with documentation that included copies of the Chiarello e-mails that he forwarded to Morgan Stanley's CFO for investigation in January 2004.

100. In or about January 2005, the SEC issued Wells Notice No. MHO-10086 to Morgan Stanley, seeking a permanent injunction and a civil penalty of $10 million due to Morgan Stanley's failure to comply with the December 3, 2002 Cease and Desist Order and Morgan Stanley's potential loss or destruction of substantial quantities of e-mails. If the Wells Notice became known in the Coleman Litigation, there would be significant repercussions because the Wells Notice charged that Morgan Stanley had destroyed e-mail and lacked the ability to produce potentially relevant e-mails.

101.    In February 2005, with Mr. Riel still on "administrative leave," Morgan Stanley submitted its response to the SEC's Wells Notice.  Morgan Stanley's response repeatedly and falsely disputed the information that Mr. Riel provided to the SEC.  Morgan Stanley also repeatedly attempted to undermine Mr. Riel's credibility.  Morgan Stanley falsely asserted that data from the Brooklyn tapes had already been moved into the Archive before Mr. Riel was placed on "administrative leave."  Morgan Stanley falsely claimed that "Mr. Riel never informed the Law Division that any e-mail had been discovered on the 'found' tapes, despite his previous commitment to do so."  In addition, Morgan Stanley falsely claimed that its Law Division did not learn that the Brooklyn tapes contained e-mail until "the end of October 2004" -- even though Mr. Riel had alerted the Law Division in June 2004 and confirmed the presence of e-mail one month later.  Morgan Stanley did not ask for Mr. Riel's input in its response to the Wells Notice.

**Q.    As The Coleman Litigation Heads Toward Trial,
Morgan Stanley Again Tries To Discredit Mr. Riel**

102.    In response to growing pressure from Coleman and from the Florida Court, Morgan Stanley disclosed in November 2004 that it had located additional backup tapes containing e-mail -- the same backup tapes that Mr. Riel warned about in June 2004.  In early 2005, Coleman requested the Florida Court to punish Morgan Stanley and to instruct the jury to draw an adverse inference against Morgan Stanley concerning the materials that it failed to produce.  Morgan Stanley reacted as it had done in its response to the Wells Notice -- by attempting to place blame upon Mr. Riel.  Morgan Stanley asserted that Mr. Riel failed to design an Archive that could produce the e-mails in a timely fashion.  Morgan Stanley again denied that its in-house lawyers were aware of the additional tapes until late 2004, even though Mr. Riel advised them of the tapes and the e-mail in June 2004 and again in July 2004.

103.    On or about March 23, 2005, the Florida Court issued an order in the Coleman Litigation in which it found that Morgan Stanley and its lawyers engaged in misconduct and "deliberately and contumaciously violated numerous discovery orders" by failing to produce  its e-mails.  The Florida Court found that Mr. Riel acted as a "whistleblower"

in connection with the SEC's Wells Notice and the SEC's ongoing investigation into Morgan Stanley's e-mail retention and its relationships with third-party vendors – which arose from the Chiarello e-mails that Mr. Riel discovered.  In addition, the Florida Court observed that no additional information was migrated to Morgan Stanley's Archive between August 18, 2004 -- the date on which Mr. Riel was placed on "administrative leave" and his IT team was disbanded -- and mid-January 2005.

104.    In April 2005, as the Coleman trial approached, Zachary Stern, one of Morgan Stanley's in-house lawyers, prepared an Offer of Proof for Mr. Riel that again attempted to place the blame for Morgan Stanley's production failures upon Mr. Riel.  The proposed Offer of Proof falsely stated that Mr. Riel believed that any search performed on Morgan Stanley's Archive "would recover all e-mails called for by the Court's Agreed Order . . . ."  The proposed Offer of Proof also stated that Mr. Riel believed that he had searched Morgan Stanley's oldest backup tapes with the use of the Archive.  The proposed Offer of Proof also contained the false statement that Mr. Riel failed to alert Morgan Stanley's Law Division of the existence of e-mails on the backup tapes.  These statements were at odds with the facts and would have constituted mail and wire fraud if they were filed with the Florida court.  Mr. Riel refused to sign the Offer of Proof, and notified Morgan Stanley's lawyers of his refusal and the falsity of the statements that Morgan Stanley wanted him to adopt.

105.    At the conclusion of the Coleman Litigation in May 2005, the jury awarded Coleman approximately $600 million in compensatory damages and an additional $800 million in punitive damages against Morgan Stanley

106.    *After* the jury issued its $1.4 billion verdict against Morgan Stanley in the Coleman Litigation, Morgan Stanley withdrew various affidavits and proffers in which its in-house lawyers, including Kempf, Cusick, Lee and Doyle asserted that they did not learn of the 1,423 Brooklyn tapes until November 2004.  Contrary to their sworn allegations, Morgan Stanley admitted that it learned of the Brooklyn tapes and the additional e-mails at or about the same time that its in-house lawyers sent the inaccurate Certification to Mr. Riel's Law IT team.

**R.**   **Morgan Stanley Improperly Terminates Mr. Riel's Employment**

107.   When the jury reached its verdict in the Coleman Litigation, Mr. Riel had been on "administrative leave" for nearly 9 months.  Morgan Stanley realized that terminating Mr. Riel's employment on the heels of a $1.4 billion verdict would draw additional and adverse media attention.  The negative publicity would also compound the damage to Morgan Stanley's reputation in the industry and harm its stock price.  Accordingly, Morgan Stanley determined to keep Mr. Riel on "administrative leave" for a while longer

108.   Morgan Stanley waited until Autumn to terminate Mr. Riel's employment, by letter dated September 27, 2005.  Morgan Stanley's termination letter was a sham.

109.   In its termination letter, Morgan Stanley asserted that after conducting a "thorough investigation," it was discharging Mr. Riel for reading other employees' e-mails – even though it was aware that Mr. Riel regularly read others' e-mails in connection with routine Archive testing and in connection with searches that he conducted for Morgan Stanley's Law Department.  The letter offered no explanation why Morgan Stanley's "investigation" took 13 months to perform.

110.   Even though the Florida Court found that Mr. Riel was a "whistleblower," Morgan Stanley denied it.  Morgan Stanley's termination letter did not confront the following facts:  (a) through his work with the Archive, Mr. Riel discovered improper conduct and conflicts of interest in Chiarello's e-mail; (b) at all times, Morgan Stanley could have verified Chiarello's wrongdoing and the conflicts of interest easily by utilizing the Archive that Mr. Riel developed; (c) the information that Mr. Riel provided to the SEC led to the SEC's issuance of a second Wells Notice to punish Morgan Stanley for its destruction of e-mails; and (d) Mr. Riel told the truth about alerting Morgan Stanley's Law Division to the e-mail on the  Brooklyn tapes.

111.   The objective behind Morgan Stanley's letter was to conceal its real motivation behind terminating Mr. Riel's employment.  In reality, Morgan Stanley terminated Mr. Riel because he took action when he discovered a violation of Morgan Stanley's Code of Conduct; because he took action when he believed that the misconduct reflected in Chiarello's e-

mails violated the SEC's directives to Morgan Stanley concerning conflicts of interest and injured Morgan Stanley's shareholders; and because he took action when he believed that Morgan Stanley's failure to retain e-mail violated the law. Finally, Morgan Stanley terminated Mr. Riel because he would not make false statements on behalf of Morgan Stanley in connection with the Coleman Litigation.

**V.**

**PLAINTIFF'S ADMINISTRATIVE SOX PROCEEDING**

112.   On December 23, 2005, Mr. Riel filed a Complaint against Morgan Stanley & Co., Inc. with the United States Secretary of Labor, through the Occupational Safety and Health Administration ("OSHA"), alleging the SOX violations described herein.

113.   On December 28, 2005, Mr. Riel filed an Amended Complaint against Morgan Stanley and Morgan Stanley & Co., Inc. with the United States Secretary of Labor, through OSHA, alleging the SOX violation, described herein.

114.   Mr. Riel fully cooperated with OSHA during the course of its investigation of his allegations.

115.   The Secretary of Labor did not issue a final decision within 180 days of the filing of the Complaint or the Amended Complaint.

116.   The Secretary of Labor's failure of the to issue a final decision within 180 days of the filing of the Complaint or the Amended Complaint was not the result of any bad faith by Mr. Riel.

117.   By letter dated June 22, 2006, Mr. Riel, by his attorneys, advised the appropriate persons, in the manner required by the OSHA regulations set forth in 29 C.F.R. § 1980.114(b), that he intended to commence this action pursuant to 18 U.S.C. § 1514A. Mr. Riel provided such written notice to the following:  (i) various OSHA officials, specifically the Regional Investigator of Whistleblower Statutes and the Supervisory Investigator; (ii) the Associate Solicitor of the United States Department of Labor ("U.S.D.O.L."), Employment Standards Administration, Division of Fair Labor Standards; (iii) the U.S.D.O.L. Administrative

Review Board; (iv) the U.S.D.O.L. Office of Administrative Law Judges; and (v) counsel for Morgan Stanley.

118.   As a result, Mr. Riel has satisfied all applicable SOX prerequisites with respect to this action.

## VI.

## CLAIM UNDER 18 U.S.C. § 1514A

119.   Plaintiff Arthur Riel repeats and incorporates the allegations set forth in Paragraphs 1-118 above.

120.   In January 2004, Mr. Riel provided information to Morgan Stanley's CFO concerning the improper solicitation of gifts from Morgan Stanley's vendors; improper conflicts of interest between Morgan Stanley executives and the company's vendors; and improprieties in the selection of an award sponsored by Morgan Stanley for the purpose of obtaining IPO business.

121.   At the time, Mr. Riel believed that the conduct complained of and the information that he forwarded constituted a violation of Morgan Stanley's Code of Conduct, and operated as a fraud with respect to Morgan Stanley's shareholders.

122.   At the time that he provided the information to Morgan Stanley's CFO, Mr. Riel was aware of SEC rulings entered against Morgan Stanley and other legal proceedings involving Morgan Stanley, which arose from undue influence exercised over various aspects of the Company's operations.   In addition, at or about the time that Mr. Riel provided the information to Morgan Stanley's CFO, the company was under investigation by the SEC for improprieties with respect to the company's relationships with and dealings with certain of its vendors.  Mr. Riel believed that the conduct he complained of violated the SEC's rules and other rulings that the SEC had made, or was preparing to make, concerning Morgan Stanley.

123.   Morgan Stanley's CFO had supervisory authority over Mr. Riel and also had authority to investigate and terminate the complained-of misconduct.

124.    In or about February 2004, June 2004, July 2004, and again in September 2004, Mr. Riel advised various in-house attorneys at Morgan Stanley that the company was engaged in the practice of recycling and overwriting approximately 18% of its backup tapes that contained e-mail information that Morgan Stanley was required to retain pursuant to one or more SEC orders and/or regulations issued by the SEC.

125.    Morgan Stanley's repeated and pervasive recycling and overwriting of thousands of backup tapes constituted a violation of Section 17(a) of the Exchange Act and other SEC orders and regulations.

126.    In addition, in June and July 2004, and again in September 2004, Mr. Riel advised various in-house attorneys at Morgan Stanley that tape restoration process would yield potentially twice as many e-mails than what Morgan Stanley previously represented to the SEC. Mr. Riel reasonably believed that the failure to advise the SEC of a potentially significant increase in restored e-mails would or could constitute a violation of a rule, regulation or order issued by the SEC.  In addition, the SEC had begun to investigate Morgan Stanley's e-mail retention practices and the process by which Morgan Stanley harvested older e-mails from its backup tapes and stored them in the Archive.  The SEC's inquiries were known to Morgan Stanley's in-house attorneys and to Kilcoyne, who was Riel's supervisor.

127.    The in-house Morgan Stanley lawyers to whom Mr. Riel disclosed the information above, and Kilcoyne, had supervisory authority over him with respect to the matters disclosed and/or had the authority to investigate, discover or terminate the misconduct in question.

128.    In October 2004, Mr. Riel provided information directly to SEC personnel to the effect that Morgan Stanley had repeatedly and pervasively recycled and overwritten thousands of backup tapes containing e-mail that Morgan Stanley was required to retain under the Exchange Act and pursuant to orders and regulations issued by the SEC.

129.   At the time, Mr. Riel reasonably believed that Morgan Stanley's overwriting and recycling of e-mail backup tapes violated rules, orders and regulations issued by the SEC and various provisions of federal law relating to fraud against shareholders.

130.   In October 2004, Mr. Riel also provided information directly to SEC personnel concerning the low "read error" rate obtained in the tape restoration process and the corresponding potential yield of twice the estimated amount of restored e-mail.   Mr. Riel reasonably believed that a failure to disclose such information in light of earlier representations to the SEC would result in a violation of rules, orders and regulations issued by the SEC or other federal law relating to fraud against shareholders.   In addition, in October 2004, Mr. Riel provided information directly to SEC personnel concerning the improper solicitation of gifts from Morgan Stanley's vendors; improper conflicts of interest between Morgan Stanley executives and the company's vendors; and improprieties in the selection of an award sponsored by Morgan Stanley for the purpose of obtaining IPO business.

131.   Mr. Riel reasonably believed that the information provided to the SEC constituted a violation of various orders, rules or regulations issued by the SEC or a violation of federal law relating to fraud against shareholders, including but not limited to Morgan Stanley shareholders.   In addition, Mr. Riel reasonably believed that he was participating or assisting in a proceeding filed or about to be filed relating to a rule or regulation of the SEC.

132.   In June and July 2004, Mr. Riel provided information to various in-house lawyers at Morgan Stanley to the effect that approximately 1,423 backup tapes recently discovered at a Morgan Stanley facility in Brooklyn contained e-mail and were not integrated into the company's Archive.

133.   On June 23, 2004, Mr. Riel signed a Certification prepared by Morgan Stanley's in-house lawyers which, through no fault or intention of Mr. Riel's, proved to be false at the time it was written.

134.   On March 8, 2005, Mr. Riel testified at a deposition conducted in the Coleman Litigation.   With Morgan Stanley's counsel in attendance, Mr. Riel provided the same

facts concerning the existence of old e-mail that was potentially subject to production in the Coleman Litigation, which he initially conveyed to Morgan Stanley's in-house counsel in June and July 2004.

135.    In or about April 2005, as the trial date approached in the Coleman Litigation, Mr. Riel refused to sign a proposed Offer of Proof that was at odds with his deposition testimony and at odds with the facts that he provided to Morgan Stanley's in-house lawyers in June and July 2004.  Mr. Riel reasonably believed that the information he provided at his deposition in March 2005, and which he refused to contradict in April 2005 with Morgan Stanley's proposed Offer of Proof, constituted a violation of 18 U.S.C. §§ 1341, 1343 and/or 1348; various rules and regulations of the SEC; and various provisions of federal law relating to fraud against shareholders committed during the Coleman Litigation.

136.    The persons to whom Mr. Riel provided the information described herein had supervisory authority over Riel with respect to the information disclosed, and/or had the authority to investigate, discover or terminate the complained-of misconduct.

137.    All of Mr. Riel's conduct described herein constituted protected activity under 18 U.S.C. § 1514A.  Morgan Stanley was fully aware of Mr. Riel's conduct as described herein, and fully aware that such conduct constituted protected activity.

138.    On September 27, 2005, Morgan Stanley improperly discharged Mr. Riel, in violation of 18 U.S.C. § 1514A, in retaliation for the protected activity in which Mr. Riel engaged and in retaliation for the disclosures in the information that Riel provided, as described above.

139.    Consequently, Mr. Riel is entitled to recover from Morgan Stanley compensatory damages, reinstatement, back pay with interest, special damages, litigation costs and reasonable attorneys' fees in an amount not less than $10,000,000.00.

## VII.

### DEMAND FOR JURY TRIAL

140.    Plaintiff demands a jury trial with respect to all claims alleged herein.

## VIII.

### REQUEST FOR RELIEF

**WHEREFORE,** Plaintiff respectfully requests this Court to enter judgment against Defendants, as follows:

(a)    an award of compensatory damages against Defendants, jointly and severally, in an amount not less than $10,000,000.00, together with back pay with interest;

(b)    reinstatement to his former employment;

(c)    an award of special damages sustained as a result of Defendants' wrongful conduct, including but not limited to litigation costs, expert witness fees and reasonable attorneys' fees;

(d)    all relief necessary or appropriate to make Plaintiff whole, as provided in 18 U.S.C. § 1514A(c)(1);

(e)    prejudgment and post-judgment interest on all amounts awarded; and

(f)    such other and further relief as may be just and proper.

Dated:  July 31, 2006

Respectfully submitted,

**KING PAGANO HARRISON**

By: _____

Jeffrey W. Pagano (JP-1408)
Gary A. Stahl (GS-3987)
75 Rockefeller Plaza
New York, New York 10019
(212) 223-4000

Attorneys for Plaintiff Arthur J. Riel